**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KMART CORPORATION and SEARS, ROEBUCK AND CO.** | **CIVIL ACTION NO. _____** |
| **VERSUS** | |
| **UNITED STATES OF AMERICA, ORLEANS LEVEE DISTRICT, LAKE BORGNE BASIN LEVEE DISTRICT, EAST JEFFERSON LEVEE DISTRICT, ST. PAUL FIRE & MARINE INSURANCE COMPANY, SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY-EAST, SEWERAGE AND WATER BOARD OF NEW ORLEANS, BOARD OF COMMISSIONERS FOR THE PORT OF NEW ORLEANS, CSX TRANSPORTATION, INC., and THE PUBLIC BELT RAILROAD COMMISSION FOR THE CITY OF NEW ORLEANS** | **SECTION_____** <br><br> **JUDGE_____** <br><br> **MAGISTRATE JUDGE_____** |

**COMPLAINT FOR DAMAGES**

NOW COMES, through their undersigned counsel, plaintiffs Kmart Corporation ("Kmart") and Sears, Roebuck and Co. ("Sears") (collectively "Plaintiffs"), who submit this Complaint for Damages.

**I. PARTIES**

**Plaintiffs**

1.

Plaintiff Kmart is a Michigan corporation with its principal place of business in Hoffmann Estates, Illinois. Kmart or its parent company, Sears Holdings Corporation ("SHC") owns or leases, and operates, stores that sell and distribute a general variety of retail and

consumer goods. At all relevant times, Kmart owned, leased, or/and managed properties and/or conducted operations in Louisiana, including Kmart store # 3665 in St. Bernard Parish.

2.

Plaintiff Sears is a New York corporation with its principal place of business in Hoffmann Estates, Illinois. Sears or SHC owns or leases, and operates, stores that sell and distribute a general variety of retail and consumer goods. At all relevant times, Sears owned, leased, or/and managed properties and/or conducted operations in Louisiana, including Sears store # 2385 in St. Bernard Parish.

3.

On February 28, 2007, Plaintiffs presented claims to the United States Army Corps of Engineers (the "Corps") for damages arising out of the failure of the New Orleans area levee and floodwall system pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. The Corps acknowledged receipt of the claims of Kmart and Sears and assigned claim numbers 07N15T0164922 and 07N15T0164921, respectively. (True and correct copies of the Corps' letters confirming Plaintiffs' claims are attached hereto as Exhibit A.) On February 28, 2007, Plaintiffs also presented claims to the Corps for damages arising out of the failure of the New Orleans area levee and floodwall system pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 30901-18, the Public Vessels Act, 46 U.S.C. §§ 31101-13, the Admiralty Extension Act, 46 U.S.C. § 30101, and the general maritime law of the United States. On information and belief, the Corps did not acknowledge receipt of these claims. (Copies of all of Plaintiffs' claims to the Corps are attached hereto as Exhibit B.) More than six months have elapsed since the

- 2 -

presentation of Plaintiffs' claims, and the Corps has failed to act by either accepting or rejecting Plaintiffs' claims. Such failure is a denial of Plaintiffs' claims.

**<u>Defendants</u>**

4.

The United States of America ("USA") is a sovereign government amenable to suit for civil liability in accordance with the FTCA, 28 U.S.C. § 2671 *et seq.*, and/or admiralty and maritime law, and/or the Constitution and Laws of the United States, and/or the Constitution and Laws of the State of Louisiana, as plead herein. USA is the proper named party defendant for negligent or delictual actions or inactions of the United States Army Corps of Engineers ("the Corps"), a division of the United States Government under the direct jurisdiction of the Department of the Army.

5.

The Orleans Levee District ("OLD") is a New Orleans governmental entity responsible for the creation, maintenance, and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in Orleans Parish with its domicile in New Orleans, Louisiana.

6.

The Lake Borgne Basin Levee District ("Lake Borgne") is a New Orleans governmental entity responsible for the creation, maintenance and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in St. Bernard Parish with its domicile in Violet, Louisiana.

7.

The East Jefferson Levee District ("EJLD") is a political subdivision of the State of Louisiana created by Louisiana Revised Statutes § 38:291, amenable to suit, and domiciled in the Parish of Jefferson, State of Louisiana.

8.

St. Paul Fire & Marine Insurance Company ("St. Paul") is a foreign insurance company, authorized to do and doing business within the State of Louisiana, which, on information and belief, at all times relevant herein, had in full force and effect a policy or policies of liability insurance, under the terms, provisions and conditions of which it assumed liability for the acts and/or negligence of its insureds, the Orleans, Lake Borgne, and East Jefferson Levee Districts, and against which Plaintiffs assert their claims under the Louisiana Direct Action Statute, Louisiana Revised Statutes § 22:1269.

9.

The Southeast Louisiana Flood Protection Authority-East ("SLFPAE") is a regional flood protection authority established as a political subdivision and levee district pursuant to Article VI, Sections 38 and 38.1 of the Louisiana Constitution and Louisiana Revised Statutes §38:330.1, and is amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

10.

The Sewerage and Water Board of New Orleans ("SWB") is a political subdivision of the State of Louisiana created by Louisiana Revised Statutes § 33:4071 *et seq.*, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

11.

The Board of Commissioners of the Port of New Orleans ("PNO") is a local government entity created by Louisiana Revised Statutes § 34:21, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

12.

Defendant CSX Transportation, Inc. ("CSX") is a foreign corporation doing business in the Parish of Orleans, State of Louisiana.

13.

Defendant Public Belt Railroad Commission for the City of New Orleans ("PBR") is an entity amenable to suit and domiciled in the Parish of Orleans, State of Louisiana. (All defendants herein are referred to collectively as "Defendants").

14.

Plaintiffs aver that this matter is timely with respect to all Defendants and is within the applicable statute of limitations as there is a related class action proceeding pending in this Court in the matter captioned *In re Katrina Canal Breaches Litigation*, No. 05-4182(K)(2). As the United States Supreme Court recognized in *Crown, Cork, & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983), "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 353-54 (quoting *American Pipe & Constr. Co. v. Utah*, 454 U.S. 538, 554 (1974)). This matter also is timely with respect to the USA pursuant to 28 U.S.C. § 2401(a).

## II. JURISDICTION

### 15.

This court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) (Defendant United States), and 28 U.S.C. § 2671, *et seq*. (Federal Tort Claims Act), violations of laws of the United States, including, but not limited to, 33 U.S.C. § 1251, *et seq*. and 16 U.S.C. § 1451 *et seq*. and, alternatively, for violation of the Constitution and Laws of the State of Louisiana as well as the Constitution and Laws of the United States.

### 16.

Plaintiffs have presented to the Corps the written, administrative claims required by the provisions of 28 U.S.C. § 2671, *et seq* (Federal Tort Claims Act) and in all respects have complied with the provisions of this statute. As discussed *supra*, a period of at least six months has elapsed since the filing of each of Plaintiffs' written, administrative claims.

### 17.

Alternatively, Plaintiffs aver jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Additionally, and in the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1367, in as much as this Court has supplemental jurisdiction over all state law claims herein arising out of the same case or controversy.

### 18.

Alternatively, Plaintiffs plead admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. § 30101, the Suits in Admiralty Act, 46 U.S.C. §§ 30901-18, and the Public Vessels Act, 46 U.S.C. §§ 31101-13. Plaintiffs have presented to the Corps the written, administrative claims required by the provisions of 26 U.S.C. § 740

(Admiralty Extension Act). A period of at least six months has elapsed since the filing of Plaintiffs' written, administrative claims.

### III. VENUE

19.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because, on information and belief, Defendants' negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, on or about August 29, 2005, and damages to Plaintiffs occurred within the Eastern District of Louisiana.

### IV. WAIVER OF SOVEREIGN IMMUNITY

20.

The United States of America and the Corps waived their sovereign immunity in connection with the claims asserted in this suit by the enactment of the Federal Tort Claims Act, 28 U.S.C. § 2671 ("FTCA"). While Plaintiffs believe that all of their claims against the Corps are derived from the FTCA applying the tort and other laws of the State of Louisiana, out of an abundance of caution, Plaintiffs alternatively plead admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. § 30101, the Suits in Admiralty Act, 46 U.S.C. §§ 30901-18, and/or the Public Vessels Act, 46 U.S.C. §§ 31103-13.

21.

Furthermore, the United States Court of Appeals for the Fifth Circuit has already held that the Flood Control Act of 1928, 33 U.S.C. § 702c does not immunize the United States of America for its maritime activities related to the MRGO. *Graci v. United States*, 456 F.2d 20 (5th

Cir. 1971). Plaintiffs further allege that the United States and the Corps have waived their immunity under the Water Pollution Act.

## V. <u>NATURE OF THE CASE</u>

### 22.

This is an action for negligence, nuisance, and strict liability against Defendants resulting from their negligence in the dredging, design, construction, maintenance, and operation of certain canal levees and flood walls, and from the Corps' negligent operation and maintenance of the Mississippi River-Gulf Outlet ("MRGO"), which caused the devastation of St. Bernard Parish and other sections of New Orleans, including damage to Kmart store # 3665 and Sears store # 2385 on or about August 29, 2005 during Hurricane Katrina ("Katrina"). Defendants could foresee that negligent operation and maintenance of the canal levees and flood walls, and the MRGO, would pose a serious risk to persons and property in St. Bernard Parish. Nevertheless, Defendants acted negligently in operating and maintaining the canal levees and flood walls, and the MRGO, and their negligence was a substantial cause of the catastrophic devastation to St. Bernard Parish, including Kmart store # 3665 and Sears store # 2385.

## VI. <u>FACTUAL BACKGROUND REGARDING THE 17TH STREET CANAL</u>

### <u>The History of the 17th Street Canal</u>

### 23.

On information and belief, the canal known today as the "17th Street Canal" forms a significant portion of the boundary between Orleans Parish, Louisiana and Jefferson Parish, Louisiana. Historically, the 17th Street Canal has also been known as the "Metairie Outlet Canal," the "Metairie Outfall Canal," the "Metairie Relief Canal," and the "Upperline Canal."

24.

On information and belief, the 17th Street Canal originated at the start of the 1850s as a canal dug through swampy ground to provide a right-of-way. It was located where the Jefferson and Lake Pontchartrain Railway was built. The railway connected the town once called Carrollton with a shipping port on Lake Pontchartrain in the area today known as Bucktown. Figure 1 depicts the current location of the 17th Street Canal.

**<u>Figure 1</u>**



Figure 4.   Map showing detailed geometry and features of the New Orleans metropolitan area

25.

On information and belief, in 1858, a secondary canal was built, connecting the original canal to the river side of the Metairie Ridge. This spur canal was situated alongside a projected street numbered "17th Street," and, thus, the canal became known as the "17th Street Canal." The term "17th Street Canal" eventually referred to the original, larger canal to which this spur canal connected.

26.

On information and belief, the community of Bucktown, where the northern end of the 17th Street Canal enters Lake Pontchartrain, was founded more than one hundred years ago as a group of fishing and hunting camps along the canal and Lake Pontchartrain. The earliest structures were wooden huts raised on stilts, and the canal served as a harbor and a mode of transportation for fishing boats.

27.

On information and belief, more substantial development in this area occurred during the mid-19th century with the construction of a commercial wharf and a resort called "Lakeport." Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard) and at the terminus of the Jefferson and Lake Pontchartrain Railway (presently Bucktown).

28.

On information and belief, the SWB took over the operation of the 17th Street Canal at the end of the 19th century. The canal was re-dredged in 1897, and again in 1929. In 1913, the SWB completed the construction of Pumping Station No. 6, which drained a large portion of New Orleans through the canal. Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats. The fleet previously had a lease agreement with the defendant SWB.

29.

On information and belief, the 17th Street Canal historically is, and at all times pertinent herein has been, a navigable waterway in New Orleans that flows into Lake Pontchartrain.

## The 17th Street Canal Dredging Project

30.

On information and belief, on July 15, 1974, the SWB initiated a project to improve drainage through the 17th Street Canal. Initially, this project called for the dredging of 2.4 miles of the canal from Pump Station No. 6 to Lake Pontchartrain to remove sediment from the canal bottom and to reshape the canal cross-section for the improvement of flow and the pump capacity of Pump Station No. 6. The removal of approximately 85,000 cubic yards of bottom sediment was anticipated.

31.

On information and belief, because dredging projects in navigable waters of the United States require a Department of the Army permit pursuant to the River & Harbors Act, the SWB filed an application with the Corps for a "Permit to Discharge or Work in Navigable Waters and their Tributaries." The Operations Division of the Corps is responsible for the issuance of permits to dredge navigable waterways. Hence, the issuance of the dredging permit for the 17th Street Canal was the province of the Corps' Operating Division, and not, for example, the Corps' Engineering Division, which is responsible for flood control.

32.

On information and belief, the permit approval process required the SWB to also obtain approval from, among others, the Louisiana Department of Public Works. In August of 1974, the Louisiana Department of Public Works responded to the 17th Street Canal dredge permit application by stating it could not complete a review of the application because the applicant (SWB) **had no soil data substantiating the stability or integrity of the canal's levees**.

33.

On information and belief, on May 23, 1977, the Corps returned the dredging application with no action because the SWB had failed to furnish information requested by, among others, the Louisiana Department of Public Works.

34.

On information and belief, in 1978, the SWB retained a civil engineering firm, Modjeski and Masters, Inc. ("M&M") to provide a plan for the design and implementation of the dredging project. On August 23, 1979, M&M submitted a second dredging permit application on behalf of the SWB. On December 29, 1980, M&M re-submitted the dredging permit application after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

35.

On information and belief, on January 28, 1981, M&M, in response to inquiries about the impact of the dredging on existing levees, issued the Corps with a memorandum addressing the stability of the existing levees and sheet pile wall along the canal. M&M's memorandum indicated that at three of the six test locations, the factors of safety **fell below the required values set by the Corps.** The handwritten report specifically stated that **"two locations yielded low factors of safety due to ... the existence of very soft clays...."**

36.

On information and belief, on March 5, 1981, the Corps issued an internal memorandum addressing the soil stability analyses provided by M&M which acknowledged that, in connection with the proposed dredging of the canal, safety factors were substantially below the minimum 1.30 factor of safety, requiring that the project be redesigned. The specific location of the canal's

levee system to which this internal memorandum referred coincides with the area where the 17th Street Canal breached during Hurricane Katrina.

37.

On information and belief, on March 31, 1981, the Corps held a public hearing regarding the 17th Street Canal dredging permit application. Discussions took place regarding whether raising the existing sheet pile wall along the canal, as opposed to dredging to deepen the canal, would provide a greater cross-section and greater pump capacity. The consulting engineer representing M&M voiced his concerns about widening the canals and stated that **not only were the levees already in violation of the Corps' engineering standards for levee stability, but that dredging attempts to remove material adjacent to the levees would only worsen the stability problem**.

38.

On information and belief, on April 20, 1981, in response to concerns that the proposed dredging of the 17th Street Canal would negatively impact the existing canal levee, M&M announced a preliminary plan to install sheet pile walls with concrete caps prior to any dredging or excavation. The sheet pile walls were to be of a sufficient height to meet all applicable flood protection criteria. An internal Corps memorandum dated June 16, 1981, based on a review of this proposal by M&M, acknowledged that a number of levee and flood wall stability problems were likely to occur should the SWB dredging be granted.

39.

On information and belief, an internal memorandum from the Corps' Engineering Division to the Corps' Operations Division, dated February 12, 1982, noted the existence of a stability problem in the 17th Street Canal at a location where excavation would directly tap the

- 13 -

sands underlying the levee. The memorandum suggested that a stability analysis be performed for the land side of the canal, incorporating effects of seepage to determine what corrective action might be needed. Sands underlay the entire 2.4 miles of the 17th Street Canal, from Pumping Station No. 6 to Lake Pontchartrain, and the stability problem recognized in this memorandum, therefore, cannot be confined to any one section of the canal.

40.

On information and belief, on August 23, 1982, Eustis Engineering Company ("Eustis") provided M&M with a more comprehensive subsoil investigation report, which in pertinent part recognized that measures "should be taken" because of "the possibility of a blow-out during extreme high water in the canal." The report also identified "preventive measures," including, "the installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the land side toe of the levee, and sealing the canal bottom." Eustis's recommendations were restricted to only specific areas of the canal, however, and not to the entire canal levee system. On November 30, 1982, M&M furnished the Corps with copies of Eustis's soil investigation report.

41.

On information and belief, on February 22, 1983, the Chief of the Corps' Engineering Division advised the SWB that the Corps believed "the installation of relief wells would be an appropriate way to provide the necessary assurance against uplift" of the 17th Street Canal s sheet piles.

42.

On information and belief, on May 9, 1983, M&M submitted on behalf of the SWB a new permit application for the 17th Street Drainage Canal Improvement Project. This application

- 14 -

was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases into one project with the project limits being Pump Station No. 6 on the south and 370.0 feet north of the Bucktown Pedestrian Bridge. The project now envisioned the **removal of 470,000 cubic yards** of canal bottom whereas the original plan called for the **removal of 85,000 cubic yards**.

43.

On information and belief, on July 27, 1983, Eustis submitted a revised soil stability report, which both confirmed the potential for a blow-out at the land side toe of the levee and extended the area of concern to the pumping station. In this report, Eustis recommended dredging a test section in the 17th Street Canal to study the hydrostatic uplift pressure.

44.

On information and belief, from November 29 to December 16, 1983, a test section was dug just south of Interstate 10. Six piezometers were installed on the Jefferson Parish side of the 17th Street Canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis submitted a report on the test dredging to the Corps on January 17, 1984. The report concluded that the piezometers monitored no relevant changes upon the dredging of the test section. The report further concluded that the possibility of a blow-out during high water conditions in the canal was probably slight. However, the piezometer study of the test section did not account for the pre-existing, permeable soils of the canal, and therefore, the study s conclusions as to stability and permeability were unreliable.

45.

On information and belief, on June 13, 1984, the Corps issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the

- 15 -

17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge..." The "Statement of Findings" issued with the permit stated that factors considered in issuing the permit included, *inter alia*, "navigation," both present and prospective flood heights and flood plain use, and "other public interests."

46.

On information and belief, the dredging project was ultimately divided into the following phases: Phase I from Pump Station No. 6 to Interstate 10; Phase II-A from Interstate 10 to Hammond Highway - Orleans side; Phase II-B from Interstate 10 to Hammond Highway - Jefferson side; and Phase III from Hammond Highway to Lake Pontchartrain.

47.

On information and belief, Phase I was completed June 1, 1984. However, because the SWB and the OLD could not reach an agreement with EJLD regarding Phase II of the Project, an extension of the permit work was granted by the Corps on February 20, 1987.

48.

On information and belief, on April 24, 1987, the Corps created a drawing with a sheet pile design that indicated that the sheet pile tips were located 16 feet lower than the bottom of the 17th Street Canal. Even as the Operations Division of the Corps was addressing the SWB permit, therefore, the Corps' Engineering Division was addressing levee wall design that might incorporate the sheet piles that were permitted under the dredging project.

49.

On information and belief, on August 11, 1988, the SWB issued the work order for Phase III of the dredging project, and the job was completed on December 6, 1989. The work order for Phase II-A of the dredging project, which included the installation of the sheet piles on the

Orleans Parish side of the canal, was issued on July 4, 1990, and the job was completed on January 10, 1992 by Boh Bros. Construction Co., Inc.

50.

On information and belief, the dredging activity conducted in the 17th Street Canal pursuant to the SWB permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal. The barges constituted vessels in navigation for the time period during which the dredging occurred.

**The Construction of 17th Street Canal Concrete Monoliths**

51.

On information and belief, without any congressional authorization or re-authorization, the Corps unilaterally deviated from a congressionally authorized "Barrier Plan," which called for the installation of floodgates at the mouth of the 17th Street Canal (at Lake Pontchartrain). Defendants SWB and OLD objected to the installation of these floodgates. The Corps thereafter proposed a "Parallel Protection Plan" for the 17th Street Canal, which called for increasing the height of the flood barriers on the east and west banks of the canal. This plan was part of an overall "High Level Plan," which replaced the "Barrier Plan," even though this change was not authorized by Congress.

52.

On information and belief, in connection with the "High Level Plan," the Corps considered three options — levees, T-walls, and I-walls. The Corps rejected the use of levees and T-walls because such construction was purportedly not economically justified. Instead, under the auspices of the Corps acting in connection with the OLD, the 17th Street Canal's flood walls were constructed with an "I-wall" design, which called for the construction of a concrete

- 17 -

monolith on top of the existing sheet pile (in place from the dredging project). Figure 2 depicts the differences in the design of the I-walls, T-walls, and levees.

**Figure 2**



Figure 3.   General schematic of major hurricane protection structures used in New Orleans and vicinity

53.

On information and belief, the U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees, dated April 30, 2000, states that for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface and that an inverted "T-wall" design is used when walls higher than seven feet are required. **Nonetheless, the I-walls on the 17th Street Canal were built in concrete sections that rise eleven (11) feet above the ground.**

54.

On information and belief, Eustis performed a soil analysis in 1981, which entailed borings along the 17th Street Canal's levee. The borings revealed alternating layers of soft clay and black humus or peat — a soft, spongy soil comprised of decaying trees and other organic material — located fifteen to twenty-one feet below sea level. This layer of humus and peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under pressure from water.

55.

On information and belief, despite Eustis's findings regarding the weak soil, the Corps elected to build the walls of the 17th Street Canal with steel sheet piling driven to a depth that was seventeen (17) feet below sea level — either above or in the middle of the layers of weak soil. To make matters worse, the soil adjacent to the 17th Street Canal levee subsided significantly after construction of the levee and flood wall, greatly reducing the amount of support that the land behind the levee provided against the pressure of waters.

56.

On information and belief, in 1993, C.R. Pittman Construction Company, Inc. ("Pittman") was retained for the construction of the concrete monoliths atop the steel sheet pile wall along the 17th Street Canal. Pittman reported to the Corps that it was encountering major problems — specifically, the sheet pile walls and concrete monoliths were beginning to lean towards the canal side as the soil foundation was not of sufficient strength, rigidity, and stability. Despite these concerns and problems, however, the Corps allowed the construction of the I-walls

to continue, and Pittman built the concrete monoliths on top of the sheet pile driven into the unstable soil.

57.

On information and belief, Defendants either failed to account for the soil and flood wall stability problems associated with the 17th Street Canal or proceeded with the engineering, design, and construction of the 17th Street Canal despite such problems. As the result of Defendants' combined negligence, the 17th Street Canal failed during Hurricane Katrina, inundating the surrounding area and causing extensive damage to Plaintiffs.

## VII. FACTUAL BACKGROUND REGARDING THE LONDON AVENUE CANAL

58.

On information and belief, the London Avenue Canal was constructed in the first half of the 19th century through an area that was mostly swampland and later became part of the City of New Orleans. The canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans and provided for swamp drainage. Figure 1, *supra*, shows the location of the London Avenue Canal.

59.

On information and belief, the London Avenue Canal historically is, and at all times pertinent herein has been, a navigable waterway within the meaning of the general maritime law.

60.

On information and belief, the Corps, in coordination with the OLD and SWB, was responsible for the design and construction of the London Avenue Canal's levee system.

61.

On information and belief, a major project to upgrade the flood walls and bridges along the London Avenue Canal began in the early 1980's. The Corps had previously proposed placing a floodgate at the hurricane levees where the London Avenue Canal entered Lake Pontchartrain to provide protection from storm surge. The OLD and SWB, however, objected to this plan and instead favored building and raising the height of the parallel flood walls and levee structures along each side of the canal (the aforementioned "Parallel Protection Plan"). By 1991, the Corps, OLD, and SWB had decided to proceed with this latter plan.

62.

On information and belief, the resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the pilings and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops) intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

63.

On information and belief, **the entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend**. The sands are located approximately 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity where the northern breach occurred during Hurricane Katrina (station 113 to 118). The sand is covered with a veneer of peaty swamp deposits.

- 21 -

64.

On information and belief, two key considerations in constructing an I-wall atop an earthen levee are: (1) the composition of the soil into which the sheet piles will be driven and upon which the I-walls will rest and (2) the depth of the sheet piles based on the composition of the soil.

65.

On information and belief, soil borings of the levee at the site of the London Avenue Canal south breach, which contributed to the catastrophe giving rise to this litigation, showed a layer of sand at a depth of 10 to 15 feet below sea level. Similar to the conditions at the south breach, soil borings of the levee at the site of London Avenue Canal north breach showed a layer of sand at a depth of 12 feet below sea level, as well as a layer of peat — a highly porous material that shrinks when dry and expands when wet, creating highly unstable soil conditions. Despite this layer of unstable sand, the sheet piles supporting the flood wall monoliths of the London Avenue Canal were driven to a depth of 14 feet below sea level. **Thus, the bottom of the sheet piles fell within a layer of sand**.

66.

On information and belief, as discussed *supra*, the flood walls along the London Avenue Canal are constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface and that an inverted "T-wall" design is used when walls higher than seven feet are required. **Nonetheless, the flood walls at the breach sites of the London Avenue Canal,**

- 22 -

**although built with an "I-wall" design, have concrete sections that rise to eleven (11) feet**
**above ground surface**.

67.

On information and belief, Defendants either failed to account for the soil and flood wall stability problems associated with the London Avenue Canal or proceeded with the engineering, design, and construction of the London Avenue Canal despite such problems. As the result of Defendants' combined negligence, the London Avenue Canal failed during Hurricane Katrina, inundating the surrounding area and causing extensive damage to Plaintiffs.

## VIII. FACTUAL BACKGROUND REGARDING THE ORLEANS AVENUE CANAL

68.

The Orleans Avenue Canal is a canal located in Orleans Parish and is connected on its north end to Lake Pontchartrain and on its south end with the SWB's Pumping Station No. 7. Figure 1, *supra*, shows the location of the Orleans Avenue Canal.

69.

On information and belief, the levee and floodwall protection system along the Orleans Canal was incomplete at the time Hurricane Katrina struck the New Orleans area. Specifically, the embankment fronting the pump station, which is about four hundred feet long, is six feet lower than the floodwalls along the canal. That is, the floodwalls in this area are simply missing. As a result, the levee and floodwall protection system designed and constructed by Defendants was incomplete and did not provide adequate flood protection for the surrounding area, causing extensive water damage to Plaintiffs.

**IX. FACTUAL BACKGROUND REGARDING HURRICANE KATRINA AND THE**
**FAILURE OF THE 17TH STREET, LONDON AVENUE,**
**AND ORLEANS AVENUE CANALS**

70.

Katrina entered the Gulf of Mexico on August 26, 2005 and exploded into a Category 5 Hurricane. It peaked in intensity in the afternoon of August 28, 2005, with maximum sustained surface wind speed of 175 miles per hour.

71.

Immediately before it made landfall on August 29, 2005, Katrina began a weakening process. It made landfall at Buras, Louisiana to the east of New Orleans at 6:10 a.m. It was a massive Category 3 Hurricane with winds about 125 miles per hour. The radius of maximum winds for Katrina was on average about 37 nautical miles, meaning that it was 9 to 14 times larger than a normal hurricane.

72.

On August 29, 2005, a major breach of 17th Street Canal occurred on the Orleans Parish side of the canal between 9:00 a.m. and 9:15 a.m. The breach rapidly scoured to depths below mean sea level, allowing lake and canal water to flow through the Orleans Parish bank of the canal well after the storm surge had subsided.

73.

The flooding as a result of the breach of the 17th Street Canal was totally catastrophic, and caused extensive damage to Plaintiffs.

74.

On information and belief, water began to enter the Gentilly area east of the London Avenue Canal between 7:00 and 8:00 a.m. on August 29, 2005, pouring through a 200-foot wide breach in the levee/flood wall on the east side of the London Avenue Canal, just north of the Mirabeau Avenue bridge. This breach is referred to as the "south breach" of the London Avenue Canal levee.

75.

On information and belief, the water from the south breach of the London Avenue Canal initially inundated the Gentilly area of New Orleans, an area bounded on the west by the London Avenue Canal, on the south by Gentilly Boulevard (the Metairie/Gentilly Ridge), on the east by the Inner Harbor Navigational Canal (the Industrial Canal), and on the north by Lake Pontchartrain.

76.

On information and belief, this water eventually combined with flood waters from other levee breaches inundating other parts of New Orleans, including Plaintiffs' properties.

77.

On information and belief, water began to enter the Gentilly area west of the London Avenue Canal sometime before 9:00 a.m. on August 29, 2005, pouring through a 400-foot wide breach in the levee/flood wall on the west side of the London Avenue Canal, just south of the Robert E. Lee Bridge. This is referred to as the "north breach" of the London Avenue Canal levee.

78.

On information and belief, the water from the north breach of the London Avenue Canal initially inundated the Gentilly area of the city bounded on the west by Bayou St. John, on the north by Lake Pontchartrain, on the east by the London Avenue Canal, and along the southeastern side on a line drawn along Chef Menteur Highway to Gentilly Boulevard to Broad Street where it intersects with Orleans Avenue and then northwest along Orleans Avenue to Bayou St. John. This water eventually combined with flood waters from other levee breaches, inundating other parts of New Orleans.

79.

On information and belief, at approximately 9:00 a.m. on August 29, 2005, as a result of Defendants' inadequate design and construction of the floodwalls along the Orleans Avenue Canal, the embankment fronting the pump station at the foot of the canal was overtopped and left unprotected by missing floodwalls, causing significant water damage to the surrounding area.

80.

On information and belief, the storm surge associated with Hurricane Katrina did not overtop the flood walls at the sites of the 17th Street, London Avenue, and Orleans Avenue Canals. Indeed, the hurricane did not exceed the designed parameters for these canals. Thus, none of the flood wall breaches in question would have occurred as a result of Hurricane Katrina alone. Rather, these breaches occurred solely as a result of Defendants' faulty and negligent engineering, design, construction, and maintenance of the 17th Street, London Avenue, and Orleans Avenue Canals.

## X. FACTUAL BACKGROUND REGARDING THE WEST BREACH OF THE INNER HARBOR NAVIGATIONAL CANAL ("IHNC" OR "INDUSTRIAL CANAL")

### 81.

On information and belief, in July 1914, New Orleans received authorization from the State Legislature to locate and construct a deep water canal between the Mississippi River and Lake Pontchartrain. Dredging of the Inner Harbor Navigation Canal ("IHNC or "Industrial Canal") began on June 6, 1918. Excavation work initiated with the construction of parallel dikes on either side of the canal. The more resistant clay materials that were excavated were dragged up onto the dikes and were gradually built up to become permanent protective levees.

### 82.

On information and belief, from the onset, contractors battled problems with slope stability when constructing the Industrial Canal, as the soft oozy soils constantly slid back into the excavation. Essentially, the levees and floodwalls along the Industrial Canal were built on a layer of organic marsh and peat with very soft clays. Fifteen feet below the top of the embankment is a layer of soft clay with silt and sand, which is a very weak material. The Corps was aware of these problems.

### 83.

On information and belief, during construction, the Port Authority decided to increase the size of the channel to a minimum depth of 30 feet at low water, with a minimum bottom width of 150 feet and a minimum channel width of 300 feet, roughly double the original design. When new wharves were constructed, the bottom width was increased to 300 feet, with a minimum canal width of 500 feet near piers and slips, and 600 feet adjacent to quays. The canal excavation

- 27 -

was completed in September 1919. The lock structure was completed on January 29, 1923. At that time, the water level in the IHNC was controlled by the tides in Lake Pontchartrain.

84.

On information and belief, in 1947, a back protection levee adjacent to the IHNC was overtopped at Tennessee Street during a hurricane, spilling ten feet of water into the eastern section of New Orleans. Fortunately, the levee did not collapse, the area was undeveloped, and the flooded properties were quickly remediated.

85.

On information and belief, the IHNC historically is, and at all times pertinent has been, a navigable waterway in New Orleans.

86.

On information and belief, the deficiencies in the construction of the Industrial Canal led to breaches on the west side of the canal during Hurricane Katrina, where a three hundred foot section of an I-wall failed at a railroad yard, and a seventy-foot section of levee comprised of a sandy "shell" fill was scoured and blew out.

87.

On information and belief, the City of New Orleans is the sole owner of the New Orleans Public Railroad Commission, a non-profit switching railroad which operates switches and terminal services for more than 100 miles of track in New Orleans.

88.

On information and belief, on or about September 11, 2004, a New Orleans Public Railroad Train derailment caused a thirty-two and a half foot wide gap in Floodgate W-30, which is part of the floodwall system situated immediately west of the Industrial Canal.

89.

On information and belief, on December 14, 2004, PBR paid OLD $427,387.96, the full estimated cost of the reconstruction of Floodgate W-30, but both PBR and OLD failed to assure these repairs were made prior to the August 2005 catastrophe giving rise to this action, resulting in extensive damage to Plaintiffs' property.

90.

On information and belief, CSX designed and constructed a railroad crossing at or near the Industrial Canal's flood protection structures. In doing so, CSX utilized highly erodible, lightweight, and/or porous materials, including, but not limited to, "shell sand" and gravel, which caused CSX's structure to be significantly weaker than the surrounding flood protection structures. CSX also failed to install a "sheet pile cutoff" or similar device to prevent or limit erosion of its structure. Indeed, CSX could have prevented the failure of its structure at a minimal cost by installing concrete "sheet pads" or other erosion protection devices at the base of the I-walls of the Industrial Canal.

91.

On information and belief, PNO has the full and exclusive right, jurisdiction, power, and authority to govern the Port of New Orleans and is responsible for the maintenance of it wharves, terminals, marshaling yards, cranes, and all transportation and infrastructure affecting the regulation of commerce. The Industrial Canal is connected to the Port of New Orleans and is within the jurisdiction and control of PNO.

92.

On information and belief, PNO never tested whether the design, construction, and/or maintenance of the structures of the Industrial Canal were adequate, proper, and compliant with

the requisite standards. PNO's failure to ensure the adequacy of the design, composition, construction, and maintenance of the Industrial Canal's levees and floodwalls contributed to the breach of the Industrial Canal on the west side.

## XI. FACTUAL BACKGROUND REGARDING THE IPET REPORT

93.

On information and belief, following Hurricane Katrina, the Corps undertook a massive investigation of the reason for the levee and flood wall failures. This investigation was coordinated by the Interagency Performance Evaluation Taskforce ("IPET"). On March 26, 2007, IPET issued its Interim Final and Final Reports concerning the Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System ("IPET Report").

94.

On information and belief, IPET was created by the Chief of Engineers, U.S. Army Corps of Engineers to evaluate the New Orleans hurricane protection system in light of Hurricane Katrina. IPET consisted of government, academic, and private sector scientists and engineers with extensive experience in the field of civil engineering. The report was consistently peer reviewed prior to publication.

95.

On information and belief, the IPET Report provides extensive background regarding the construction of the hurricane protection system and reveals that, almost from the start, construction was based on inaccurate assumptions and calculations. IPET found that deficiencies existed throughout the levee system, which was constructed at an elevation below design specifications.

96.

On information and belief, IPET summed up its analysis of the hurricane protection system with the concession that its performance was compromised by the incompleteness of the system, the inconsistency in levels of protection, and the lack of redundancy. Volume I of the IPET Report made the following overall conclusions regarding the failure of the levees:

- Flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to a geodectic vertical datum *incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation.*

- Sections of the system were built below specified design elevations due to the *use of an inaccurate relationship between the geodectic datum and mean sea level datum.*

- Coupled with the *use of average values* obtained from widely spaced samples in a geology with highly variable conditions, the structure was left *with a marginal factor of safety.*

- The structures were constructed on weak and compressible soils.

- The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection.

- *Four breaches*, all in the outfall canals and all involving I-walls, *occurred before water levels reached the top of the floodwalls. All were caused by foundation failures* induced by the formation of a gap along the canal side of the floodwall. . . . *This failure mechanism*, in particular the gap formation, *was not considered in the original design of the structures.*

- The maintained condition of the levees was an additional negative factor in the performance of the system.

## XI. NEGLIGENT AND INHERENTLY DANGEROUS DESIGN CRITERIA AND REGULATORY VIOLATION BY THE CORPS CONCERNING THE LPV

97.

On information and belief, most of the levee and/or I-Wall structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and Vicinity, Hurricane Protection Project" (the "LPV"). Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain. The Corps was responsible for project design and construction.

98.

On information and belief, the overall design criterion of the Lake Pontchartrain Project mandated by Congress was to protect the area from "the most severe combination of meteorological conditions considered characteristic for the region." The Corps expected these conditions to occur once in 200 to 300 years, and they were deemed to be equivalent with the "Standard Project Hurricane" ("SPH"). However, the Corps based its overall design specifications on the 1959 Weather Bureau 1-in-100 year SPH, which was contradictory to Congress' mandate to protect against a 1-in-200 year to a 1-in-300 year hurricane.

99.

On information and belief, the 1959 SPH was known by the Corps to be obsolete by 1972, just as construction of initial parts of the Lake Pontchartrain Project and the floodwalls along the IHNC was getting underway. The 1959 SPH specification of maximum sustained wind speeds of 107 mph was increased by the National Weather Service to 129 mph. An increase of 20 percent in maximum winds results in up to a 40 percent elevation of maximum surge

- 32 -

elevation. In 1979, the National Oceanic and Atmospheric Administration ("NOAA") raised the maximum sustained winds again to 140 mph, a category 4 hurricane (Technical Report NWS 23), which further exacerbated the Corps' design deficiencies. In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation RR 1110-1453. The regulation provides direction for the development of SPH and Probable Maximum Hurricane wind fields along the Gulf and east coast of the United States. The regulation states specifically:

> 5. Requirements. ER 1110-2-1453 provides direction on the selection of the level of protection to be afforded by Corps flood damage prevention projects in urban areas. All field operating activities having Civil Works responsibilities are required to use the National Oceanic and Atmospheric Administration (NOAA) Technical Report NWS 23 for specifying meteorological criteria for SPH and PMH wind fields along the gulf and east costs of the United States.

Notwithstanding these events and the history of the area to date, the Corps negligently failed to consider any alteration of the project to strengthen the protection from flooding and in failing to do so negligently or intentionally violated this regulation. In ignoring this order to revise all SPH-based analysis to reflect the new understanding of threat, the Corps elected to base its designs for the Lake Pontchartrain Project on the 1959 SPH. Such negligence or intentional act in violation of law significantly increased the flooding risk to the Greater New Orleans area from hurricane storm surge.

100.

On information and belief, in addition to the application of the wrong SPH, the Corps elected to base the overall design specifications on the wrong elevation datum. The Corps applied the National Geodetic Vertical Datum of 1929 ("NGVD29") even though it was aware of the fact that NGVD29 was not any longer equal to — and interchangeable with — local mean

sea level ("LMSL"). LMSL was the only relevant datum for superimposition of hurricane surge and wave height from a 1950s-era oceanographic analysis. However, when the Corps adopted design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and, thus, the floodwalls crowns were constructed lower by this margin. This design flaw was continued with the use by the Corps of the outdated NGVD29 adjustment for elevation control up to the time of Katrina. As a result, no provision was made to account for the 3 to 4 feet/century subsidence rates characteristic of the Greater New Orleans metropolitan area even though this rate was known or should have been known by the Corps at the time of congressional authorization of the Lake Pontchartrain Project.

101.

On information and belief, crown elevation deficiencies ranging up to 6 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees along IHNC that otherwise would have been overtopped only briefly, if at all. Prolonged overtopping led to catastrophic breaches into the greater New Orleans area east of the IHNC in New Orleans East and the Lower Ninth Ward of Orleans Parish, as well as in St. Bernard Parish.

102.

On information and belief, the original and only project design authorized by Congress, known as the "Barrier Plan," included a series of levees along the lakefront, concrete floodwalls along the IHNC, and control structures, including barriers and flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook at the northern end of the IHNC. These structures were intended to prevent storm surges from entering Lake Pontchartrain and the IHNC via the

MRGO's confluence with GIWW, all thus protecting from overflowing the levees along the lakefront and the floodwalls along the IHNC and other areas.

103.

On information and belief, the Barrier Plan was selected by the Corps and authorized by Congress over another alternative, known as the "High-Level Plan," which excluded the barriers and flood control gates at the Rigolets, Chef Menteur Pass, and Seabrook complexes, and instead employed higher levees and flood protection structures along the lakefront and along the IHNC. The estimated completion date of the Barrier Plan was 1978. The Barrier Plan was selected because the High Level Plan was believed to have many serious drawbacks, including the following:

- a. High Level Levees would take years or longer to construct because of subsidence problems;

- b. They would be wider, thus requiring more rights of way;

- c. In some locations floodwalls (which are more vulnerable to severe damage and/or rupture by impact of runaway vessels during a hurricane and would virtually destroy the esthetic quality of the lakefront) are required rather than levees;

- d. More rights of way would result in displacement of more residences, businesses, et cetera;

- e. With higher Lake levels, the interior drainage system would be severely hampered;

- f. The High Level Plan would offer no protection to less densely populated areas such as the North Shore;

- g. Lakefront Levees would have to be 6 to 9 feet higher than the present design grade.

- 35 -

104.

On information and belief, in studies leading to project authorization, the high level plan as determined to cost approximately 50 percent more than the Barrier Plan.

105.

On information and belief, the final design memoranda for the floodwalls along the IHNC/Industrial Canal were completed in the late 1960s, and construction was completed in the 1970s.

106.

On information and belief, during the 1970s, the control complexes at the Rigolets and Chef Menteur faced significant opposition from environmentalists. The Corps was unable to produce a satisfactory Environmental Impact Statement for the Barrier Plan and in 1984 abandoned the Barrier Plan and elected to implement the High-Level Plan even though the High-Level Plan was believed to have many serious flaws. Despite this unilateral, unauthorized negligent, grossly negligently, wanton, and/or reckless abandonment of the Barrier Plan by the Corps, it took no action to adjust the floodwalls that were built along the IHNC/Industrial Canal and elsewhere to the new high-level design, thus leaving them at a considerably lower design.

107.

On information and belief, at the time of Hurricane Katrina on or about August 29, 2005, the Lake Pontchartrain Project was still under construction, 40 years after its authorization. While most public works structures would be scheduled for replacement or rehabilitation after 40 years, planning for a more modern system was negligently, grossly negligently, wantonly, or recklessly put off while the original project remained incomplete and continued to fall further behind in achieving a completion date. The Corps' design assumptions and policy negligently

- 36 -

made in 1965 continue to diminish the Lake Pontchartrain Project today, and were a proximate cause of the flooding of the Greater New Orleans area.

## The Failure of the Hurricane Protection System

108.

On information and belief, as Katrina's storm surge increased in intensity, water levels within the MRGO, the GIWW and the IHNC/Industrial Canal began to rise, and certain levees and floodwalls collapsed or were otherwise compromised or overtopped due to construction by the Corps with porous, erodible lightweight "shell sand" fill or other inappropriate fill material not suitable for levee construction, especially without sheetpile cutoff, concrete, armoring, or similar features to prevent erosion, undercutting, collapse or failure, or due to negligently inadequate height. The effects of such negligent and defective design and construction of levees and floodwalls by the Corps was further exacerbated along certain levees and flood walls along the GIWW, MRGO, and/or IHNC/Industrial Canal by the speeding impact of the surge jet entering from the east through the MRGO/GIWW ship channel at the "Funnel."

109.

On information and belief, these breaches in the Greater New Orleans area caused extensive harm and damage in Orleans and St. Bernard Parishes. These breaches were the result of the negligence, fault, gross negligence, and/or reckless or wanton conduct of the Corps and resulted from violations by the Corps, or those working on their behalf for whom they are responsible, of Federal and State and other mandated or generally accepted designs for and methods of construction for levees, I-Walls, flood walls, and other similar structures that failed during and following Hurricane Katrina which conduct/actions/inactions, engineering errors,

- 37 -

were a proximate cause of the damages sustained by Plaintiffs alleged herein. Negligent, grossly negligent, wanton, or reckless engineering lapses and/or lapses in oversight during design and construction were also proximate causes.

110.

Additionally, on information and belief, floodwalls, levees, and/or other structures failed causing harm to Plaintiffs through the negligent design, construction, engineering, maintenance, and/or inspection by the Corps and/or its contractors and subcontractors involved in levee, I-wall, spoil banks, or similar construction in or around New Orleans East, Lower Ninth Ward, and St. Bernard Parish. Figure 2 demonstrates the types of hurricane protection structures in use at the time of Hurricane Katrina.

**<u>Violation By Corps Of Its Own Design And Construction Criteria</u>**

111.

Additionally, on information and belief, the Corps and its contractors violated its/their own design, engineering and construction criteria for levees, flood walls, and/or spoil banks, and violated the Coastal Zone Management Act in failing to comply with the Louisiana and/or Federal regulations affecting design, engineering, construction, maintenance, and operations of levees, floodwalls, and spoil banks. As such, the Corps is liable to Plaintiffs. As a proximate result of the negligent, grossly negligent, reckless, wanton, and/or illegal acts or omissions of the Corps described herein in this Complaint, Plaintiffs sustained damages.

- 38 -

## XII. FACTUAL BACKGROUND REGARDING THE DESIGN, CONSTRUCTION, OPERATIONS, AND MAINTENANCE OF THE MRGO

### Authorization And Construction Of MRGO

112.

In 1943, Congress requested a report from the Chief of Engineers, Secretary of the Army, on the viability of the MRGO. The River and Harbor Act authorized the report, and Congress approved the report on March 2, 1945.

113.

On September 25, 1951, a report dated May 5, 1948, from the Chief of Engineers, United States Army ("Chief's Report") was transmitted to Congress. It recommended the construction of a deep-draft channel on the east side of the Mississippi River. The channel was to be 36 feet deep and 500 feet wide, increasing at the Gulf of Mexico to 38 feet deep and 600 feet wide.

114.

Construction of the channel was to be done "generally in accordance with the plans of the division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable."

115.

Ultimately, Public Law Number 84-455, 70 Stat. 65 (1956) authorized the land-cut channel, and the law was to be construed "substantially in accordance with" the recommendation contained in the Chief's Report.

116.

Construction of the MRGO was completed to full dimensions in 1968.

## Authorization And Construction Of LPV

117.

On June 15, 1955, following a series of hurricanes, Congress authorized the Corps to study projects to protect areas along the eastern and southern coasts from hurricane storm surges. As one product of these studies, the Corps produced what came to be known as the Lake Pontchartrain and Vicinity Hurricane Protection Plan ("LPV"). The Corps intended the LPV to provide a degree of protection against hurricanes equivalent to the surge and wave action predicted to result, although the Corps took into account the Probable Maximum Hurricane, which was a stronger, although less likely event.

118.

Congress passed the LPV on October 27, 1965 as the Flood Control Act of 1965, 29 Stat. 1073, 1077 (42 U.S.C.A. § 1962d-5) three years before the MRGO was completed. Congress authorized the project for hurricane-flood protection on Lake Pontchartrain, Louisiana "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress…."

119.

On information and belief, the levees that failed during Katrina were created pursuant to this statute. Among them: levees known as the Chalmette Area Unit, constructed to protect the Ninth Ward and St. Bernard Parish. These levees consist of the MRGO Reach 1 Levee (which runs along the southern bank of the GIWW/MRGO), the MRGO Reach 2 Levee, and the Verret Levee, also referred to as the Chalmette Extension. These levees, along with the 40 Arpent Levee (a non-Corps levee), create the boundaries of the Central Wetlands Unit.

**The Corps Failure To Operate And Maintain The MRGO**

120.

The Corps understood from the inception of the MRGO that, because of its location, degradation of the area would result unless the Corps took proper, prophylactic measures.

121.

Corps Design memorandum No. 1-B for the MRGO, dated September 1958 and revised in May 1959, noted that wave wash from large vessels would, with time, erode the banks of the channel, and that foreshore protection would be necessary to prevent such erosion.

122.

In a July 2003 article, the MRGO operations manager wrote, "MRGO bank erosion has historically and is currently occurring at high rates, mainly due to ship waive impact. An analysis of bank line retreat from 1964 to 1996 shows that the banks are being lost at about 12 to 26 ft/yr (Britsch and Ratcliff, 2001). Bank erosion results in channel shoaling, which requires periodic maintenance dredging. The current scenario is largely unsustainable from the engineering, environmental, and economic perspectives." Thus, the Corps itself admitted that wave wash had eroded the MRGO's banks at "high rates," and that the bank erosion was not sustainable moving forward.

**South Bank Erosion**

123.

The original MRGO authorization by Congress contemplated armoring the south bank of Reach 2 of the MRGO, and the Chief of Engineers of the Corps officially authorized and approved such action in 1967. Because the south bank of Reach 2 abutted the Reach 2 Levee, responsible maintenance of the MRGO would have included this protection. A 1962 report by

the District Engineer stated, "Riprap foreshore protection against erosion by wave wash from shipping will be provided." In 1968, the Chief of Engineers determined that all of the costs of foreshore protection would be charged to the MRGO.

124.

Nonetheless, from 1968 until 1982, the Corps failed to construct foreshore protection. It took 12 years for the Corps, in March of 1980, to determine that "due to technical problems related to extremely poor foundation conditions, additional study and revision of the original design [for foreshore protection] is necessary." Thus, the failure to install timely necessary foreshore protection impacted the Reach 2 Levee itself as early as 1980.

125.

Finally, foreshore protection testing along the Reach 2 levee was begun in 1982 from Reach 2. The Corps apparently completed this testing in February of 1983. On June 28, 1985, a contract was awarded to construct foreshore protection along the South Bank of Reach 2. The contract was accepted as substantially completed on October 28, 1986.

126.

Corps efforts to repair the foreshore protection during the 1990s, however, indicate that the Corps knew that the MRGO was causing severe erosion continuously – even to the point that the attempts at protection were not withstanding the currents.

**North Bank Erosion**

127.

No foreshore protection for the North Bank of Reach 2 was forthcoming until the 1990s by which time catastrophic damage to the wetland banks of the MRGO had occurred. It is clear that the Corps had knowledge by the early 1970s that protection was necessary. Nonetheless, the

Corps clearly took the position that its primary mission was to keep the shipping channel open to deep draft traffic regardless of the consequences.

128.

While the Corps conducted studies acknowledging the erosion problem and the need for foreshore protection in 1984 and in 1988, until the cost of providing foreshore protection proved to be less expensive than the continued need for dredging to maintain the channel's navigability, the Corps did not actively pursue funding for this protection.

129.

It is apparent that the Corps refused to undertake any foreshore protection project without any local funding, even though the Corps had other methods for taking action.

130.

From the first recognition of erosion, the Corps neglected the north shore of Reach 2. The Corps' sole focus with respect to foreshore protection became protecting the south shore, but even this was accomplished at a deleteriously slow pace.

131.

Even with the knowledge that the erosion problem was potentially cataclysmic for the lives and property of those who lived and did business in St. Bernard Parish, the Corps made no effort to use the Chief's discretionary power to provide foreshore protection. Nor did the Corps ever apprise Congress directly of the possibility of disaster that the MRGO created.

132.

The Corps knew at least from the early 1970s that the MRGO was endangering the Chalmette Unit Reach 2 Levee. It knew that a primary source of the devastating shoaling was as a result of the wave wash that occurred with each ship that navigated the channel. Even though it

was determined unequivocally in 1968 that the funding for the South Bank would be under the MRGO rubric, until 1982 nothing was done and it was not completed until 1986. Moreover, nothing was done until the early 1990s to protect the North Bank.

133.

Because the Corps failed to armor the banks of the MRGO when it saw the environmental effects that the channel caused, three processes came into play which affected the MRGO levee. Lateral displacement caused a substantial reduction in the height elevation of the levee. The berm which helps protect the levee (both stability and wave berm) was reduced to dangerous levels. Finally, the fetch or the open water length over which wind can blow and create greater wave action increased. As the width or fetch of the MRGO grew substantially more forceful frontside wave attack on the Reach 2 levee during Katrina was created.

**Salinity And  Wetlands Erosion**

134.

A 1962 Interim Report on the LPV by the Corps acknowledged that the MRGO removed natural barriers to the intrusion of salt water, which caused increasing levels of salinity.

135.

Increased salinity ultimately led to a reduction in the amount of vegetation in the marshes and wetlands separating the Gulf from New Orleans.

136.

An October 1972 "Environmental Baseline Study" prepared for the St. Bernard Parish Policy Jury, which was given to the Corps, reported marked increases in salinity in the MRGO. The measurements were generated using data from the Corps, but the Corps did not respond to

the report.

137.

By 1973, 47,000 acres of wetlands had been destroyed by the MRGO and an additional 73 square miles of wetlands were lost from 1973 to the time of Katrina. Even though the Corps was aware by the early 1970s of feasible mitigation methods with respect to the loss of wetlands, it took no action.

**Lateral Soil Displacement And Levee Height**

138.

A 1958 study conducted by the Corps noted that the type of soil through which it cut MRGO would "probably displace laterally under fairly light load." The study informed the Corps that due to lateral displacement of soil into the channel, the Reach 2 Levee would incrementally lower, but that the Corps could substantially ameliorate this effect if it armored the berm fronting the MRGO.

139.

When the Corps constructed the MRGO, it placed the soil removed from the channel on the west bank of the MRGO, thereby placing weight on or "loading" the marsh. On information and belief, this weight caused soil to slough back into the channel, which would then require additional dredging. This cycle significantly contributed to the sinking of the MRGO Levee.

140.

Lateral displacement caused 25% of the shrinkage of the levee crest or height or protective elevation, which could have been prevented by foreshore protection, among other things.

- 45 -

141.

On information and belief, had the Corps employed foreshore protection before 1975, the lateral displacement process could have been prevented or at least slowed down.

**Increased Fetch**

142.

The Corps' failure to armor the banks of the MRGO led to an average erosion of the East Bank of 22 feet per year and an average erosion of the West Bank of 11 feet per year, for an average erosion of 33 feet per year.

143.

At the time of Katrina, the total average channel width of the MRGO was 1970 feet — about three times its authorized design width of 650 feet.

144.

The wave height generated by the storm surge created by Katrina was a function of the depth of the water and the width of the expanse over which the wind impacted the water, or "fetch."

145.

Because the Corps allowed the width of the MRGO to triple, the fetch grew, resulting in an increase in the intensity of the wave strength that attacked the MRGO Levee during Katrina.

**Katrina**

146.

Katrina entered the Gulf of Mexico on August 26, 2005 and exploded into a Category 5 Hurricane. It peaked in intensity in the afternoon of August 28, 2005, with maximum sustained surface wind speed of 175 miles per hour.

147.

Immediately before it made landfall on August 29, 2005, Katrina began a weakening process. It made landfall at Buras, Louisiana to the east of New Orleans at 6:10 a.m. It was a massive Category 3 Hurricane with winds about 125 miles per hour. The radius of maximum winds for Katrina was on average about 37 nautical miles, meaning that it was 9 to 14 times larger than a normal hurricane.

148.

By 6:30 a.m. on August 29, 2005, water entered the Central Wetlands Unit and the Reach 2 levee was experiencing frontside erosion.

149.

Because of the increased fetch of the MRGO, wave regeneration occurred, making the forces against the levee scour out the front of Reach 2 Levee, causing its catastrophic breach by 8:30 a.m.

150.

The breach of Reach 2 Levee caused the Central Wetlands Unit to fill with water and allowed water to overflow at the 40 Arpent Levee at 8:30 a.m.

- 47 -

151.

The overtopping of the 40 Arpent Levee resulted in the destruction of much of St. Bernard Parish and the damage to Sears store # 2385 and Kmart store # 3665 in Meraux, Louisiana.

152.

As a proximate result of the negligent, grossly negligent, reckless, wanton, and/or illegal acts or omissions of the Corps described herein, Plaintiffs sustained damages.

**XIII.   FACTUAL BACKGROUND REGARDING THE ACTIONS OF OLD**

153.

On information and belief, defendant OLD was granted the authority to establish adequate drainage and flood control in Orleans Parish and other areas within the jurisdiction including the IHNC/Industrial Canal. OLD was specifically granted authority to erect flood control works as they relate to tidewater flooding, hurricane protection, and saltwater intrusion. OLD was required to engage in the construction and maintenance of levees/floodwalls and/or spoil banks. All levee districts and their commissioners, including OLD, have the responsibility for the care and inspection of levees.

**XIV. FACTUAL BACKGROUND REGARDING THE ACTIONS OF LAKE BORGNE**

154.

Plaintiffs re-allege all allegations contained herein and aver that Defendant Lake Borgne was granted the authority to establish adequate drainage and flood control in St. Bernard Parish and other areas within its jurisdiction including 40 Arpent Canal. Lake Borgne was specifically granted authority to erect flood control works as they relate to tidewater flooding, hurricane

protection, and saltwater intrusion. Lake Borgne was required to engage in the construction and maintenance of levees/floodwalls and/or spoil banks. All levee districts and their commissioners, including Lake Borgne, have the responsibility for the care and inspection of levees.

155.

On information and belief, the levees/floodwalls/spoil banks protecting St. Bernard Parish along the area near the MRGO and 40 Arpent Canal failed in some instances during August 29, 2005, and were overtopped in others. Following the storm, it was determined by independent engineers that the levees/spoil banks in St. Bernard Parish had subsided significantly since their initial construction. These independent studies concluded that this change in elevation also caused and contributed to the failure and overtopping of levees/spoil banks in St. Bernard Parish. The responsibility for this failure lies, in whole or in part, with Lake Borgne.

## XV.  DAMAGES SUSTAINED BY PLAINTIFFS

156.

Plaintiffs aver that they have sustained property damage in the amount of approximately $14,500,000 to Kmart store # 3665 and Sears store # 2385, and have sustained additional damages including, but not limited to, lost rental value and business earnings, as a direct and proximate result of the negligence and/or fault of Defendants. Plaintiffs further aver that they continue to sustain damages as a direct and proximate result of the negligence and/or fault of Defendants.

## COUNT I:

## NEGLIGENCE OF DEFENDANTS
## IN THE DREDGING OF THE 17TH STREET CANAL

157.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

158.

The Corps, OLD, EJLD, and SWB had the legal responsibility and duty to Plaintiffs to cause, allow, and/or conduct the dredging of the 17th Street Canal in a manner that would not compromise the safety of the canal's levee/flood wall system. As discussed, *supra*, on information and belief, the Corps, OLD, EJLD, and SWB ignored federal regulations and engineering standards and entirely disregarded overwhelming evidence that the dredging of the 17th Street Canal would dangerously compromise the canal s flood protection levee.

159.

On information and belief, as a result of the negligence of the Corps, OLD, EJLD, and SWB, the dredging of the 17th Street Canal worsened the stability of the canal's levee and flood walls and eventually contributed to the failure of the canal during Hurricane Katrina, causing extensive damage to Plaintiffs. Defendant St. Paul, as the insurer of OLD and EJLD, is directly liable to Plaintiffs for their damages.

160.

On information and belief, as a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the dredging of the 17th Street Canal, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable),

loss of rental value and business earnings, attorneys  fees, and other special damages to be proven at trial.

161.

To the extent SLFPAE is a successor in interest to the OLD and EJLD, Plaintiffs incorporate their allegations against Defendants in paragraphs 157-160 against SFLPAE as well, as though fully set forth herein.

## COUNT II:

## NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION AND MAINTENANCE OF THE 17TH STREET CANAL LEVEES AND FLOOD WALLS

162.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

163.

On information and belief, the Corps, OLD, EJLD, and SWB had a legal responsibility and duty to Plaintiffs to cause, allow, and/or conduct the design and construction of the levees and flood walls of the 17th Street Canal in a manner that would not compromise the safety of the canal s levee/flood wall system. As discussed, *supra*, the Corps, OLD, EJLD, and SWB knew or should have known of the deficiencies in the design and construction of the 17th Street Canal, particularly given the nature of the soil in the area and the height and instability of the I-walls.

164.

On information and belief, the Corps, OLD, EJLD, and SWB negligently abandoned a congressionally authorized plan to install floodgates at the 17th Street Canal, which would have

lessened the storm surge from Hurricane Katrina, opting instead to use a "parallel" plan pursuant to which the 17th Street Canal levee and flood wall system was inadequately designed and built.

165.

On information and belief, the Corps, OLD, EJLD, and SWB negligently ignored multiple reports regarding the weak and unstable sand and soil below the 17th Street Canal and negligently designed and constructed the 17th Street Canal with I-walls built at 11 feet above ground, despite engineering guidelines discouraging the use of I-walls at heights greater than 7 feet above ground.

166.

On information and belief, the Corps, OLD, EJLD, and SWB negligently failed to maintain and inspect properly the 17th Street Canal levee/flood wall system, which would have led to the correction or exposure of its deficiencies such that the failure of the system could have been prevented.

167.

On information and belief, as a result of the negligence of the Corps, OLD, EJLD, and SWB, the design and construction of the 17th Street Canal worsened the stability of the canal's levee and flood walls and eventually contributed to the failure of the canal during Hurricane Katrina, causing extensive damage to Plaintiffs. Defendant St. Paul, as the insurer of OLD and EJLD, is directly liable to Plaintiffs for their damages.

168.

On information and belief, as a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the design, construction, and maintenance of the 17th Street Canal, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both

immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial.

169.

To the extent SLFPAE is a successor in interest to the OLD and EJLD, Plaintiffs incorporate their allegations against Defendants in paragraphs 162-168 against SFLPAE as well, as though fully set forth herein.

**COUNT III:**

**NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE LONDON AVENUE CANAL LEVEES AND FLOODWALLS**

170.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

171.

On information and belief, the Corps, OLD, EJLD, and SWB had a legal responsibility and duty to Plaintiffs to cause, allow, and/or conduct the design and construction of the levees and flood walls of the London Avenue Canal in a manner that would not compromise the safety of the canal s levee/flood wall system. As discussed, *supra*, the Corps, OLD, EJLD, and SWB knew or should have known of the deficiencies in the design and construction of the London Avenue Canal, particularly given the nature of the sand and soil in the area and the height and instability of the I-walls.

172.

On information and belief, the Corps, OLD, EJLD, and SWB negligently abandoned a congressionally authorized plan to install floodgates at the London Avenue Canal, which would

have lessened the storm surge form Hurricane Katrina, opting instead to use a "parallel" plan pursuant to which the London Avenue Canal levee and flood wall system was inadequately designed and built.

173.

On information and belief, the Corps, OLD, EJLD, and SWB negligently ignored multiple reports regarding the weak and unstable sand and soil below the London Avenue Canal and negligently designed and constructed the London Avenue Canal with I-walls built at 11 feet above ground, despite engineering guidelines discouraging the use of I-walls at heights greater than 7 feet above ground.

174.

On information and belief, the Corps, OLD, EJLD, and SWB negligently failed to maintain and inspect properly the London Avenue Canal levee/flood wall system which would have led to the correction of or exposure of its deficiencies such that the failure of the system could have been prevented.

175.

On information and belief, as a result of the negligence of the Corps, OLD, EJLD, and SWB, the design and construction of the London Avenue Canal worsened the stability of the canal's levee and flood walls and eventually contributed to the failure of the canal during Hurricane Katrina, causing extensive damage to Plaintiffs. Defendant St. Paul, as the insurer of OLD and EJLD, is directly liable to Plaintiffs for their damages.

176.

As a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the design, construction, and maintenance of the London Avenue Canal, Plaintiffs suffered

- 54 -

extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial.

177.

To the extent SLFPAE is a successor in interest to the OLD and EJLD, Plaintiffs incorporate their allegations against Defendants in paragraphs 170-176 against SFLPAE as well, as though fully set forth herein.

**COUNT IV:**

**NEGLIGENCE OF DEFENDANTS IN THE DESIGN,
CONSTRUCTION, AND MAINTENANCE OF THE ORLEANS AVENUE
CANAL LEVEES AND FLOODWALLS**

178.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

179.

On information and belief, the Corps, OLD, EJLD, and SWB had a legal responsibility and duty to Plaintiffs to cause, allow, and/or conduct the design and construction of the levees and flood walls of the Orleans Avenue Canal in a manner that would not compromise the safety of the canal s levee/flood wall system. As discussed *supra*, the Corps, OLD, EJLD, and SWB knew or should have known of the deficiencies in the design and construction of the Orleans Avenue Canal, particularly given the embankment fronting the pump station at the foot of the canal that was left unprotected by missing floodwalls.

180.

On information and belief, as a result of the negligence of the Corps, OLD, EJLD, and SWB, the design and construction of the Orleans Avenue Canal failed to provide adequate flood protection to the surrounding area, causing extensive damage to Plaintiffs' property.  Defendant St. Paul, as the insurer of OLD and EJLD, is directly liable to Plaintiffs for their damages.

181.

On information and belief, as a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the design, construction, and maintenance of the Orleans Avenue Canal, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption expenses, loss of revenue and income, attorneys' fees, and other special damages to be proven at trial.

182.

To the extent SLFPAE is a successor in interest to the OLD and EJLD, Plaintiffs incorporate their allegations against Defendants in paragraphs 179-182 against SFLPAE as well, as though fully set forth herein.

## COUNT V:

## NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE WEST SIDE OF THE IHNC

183.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

184.

On information and belief, the Corps, PNO, CSX, and PBR had a legal responsibility and duty to Plaintiffs to cause, allow, and/or conduct the design and construction of the levees and flood walls of the Industrial Canal in a manner that would not compromise the safety of the canal s levee/flood wall system.  As discussed *supra*, the Corps, PNO, CSX, and PBR knew or should have known of the deficiencies in the design, construction, and maintenance of the Industrial Canal.

185.

On information and belief, as a result of the negligence of the Corps, PNO, CSX, and PBR in the design, construction, and maintenance of the Industrial Canal, the Industrial Canal breached on the west side.

186.

On information and belief, as a direct and proximate result of the negligence of the Corps, PNO, CSX, and PBR in the design, construction, and maintenance of the Industrial Canal, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial.

## COUNT VI:

## DEFENDANTS  NEGLIGENCE IN IMPLEMENTING THE "LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY,  HURRICANE PROTECTION PROJECT"

187.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

188.

On information and belief, the Corps, OLD, EJLD, Lake Borgne, SWB, and St. Paul had a legal responsibility and duty to Plaintffs to cause, allow, and/or conduct the implementation of the Lake Pontchartrain Project in a manner that would not compromise the safety of the hurricane protection system.  As discussed *supra*, the Corps, OLD, EJLD, Lake Borgne, SWB, and St. Paul knew or should have known of the deficiencies in the implementation of the Lake Pontchartrain Project as Defendants purposefully rejected the congressionally authorized Barrier Plan and instead implemented a parallel protection plan utilizing a flawed I-wall design.

189.

On information and belief, as a result of the negligence of the Corps, OLD, EJLD, Lake Borgne, SWB, and St. Paul, the 17th Street Canal, London Avenue Canal, Orleans Avenue Canal, Industrial Canal, and the GIWW failed catastrophically, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial.

190.

To the extent SLFPAE is a successor in interest to the OLD, EJLD, and Lake Borgne, Plaintiffs incorporate their allegations against Defendants in paragraphs 187-189 against SFLPAE, as though fully set forth herein.

## COUNT VII:

## STRICT LIABILITY AS TO THE 17TH STREET, LONDON AVENUE, AND ORLEANS AVENUE CANALS

191.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

192.

On information and belief, the Corps, OLD, EJLD, SWB, and St. Paul had, at all relevant times, the care, custody and control, and thus the *garde* of the 17th Street, London Avenue, and Orleans Canals and the levees/floodwalls adjacent thereto. As such those Defendants strictly liable to Plaintiffs for their damages resulting from the vices and/or defects within these canals and their levees/floodwalls, in accordance with Louisiana Civil Code article 2317, *et seq*.

193.

On information and belief, the Corps and PNO had, at all relevant times, the care, custody and control, and thus the *garde* of the Industrial Canal and the levees/floodwalls adjacent thereto. As such those Defendants are strictly liable to Plaintiffs for their damages resulting from the vices and/or defects within the Industrial Canal and its levees/floodwalls, in accordance with Louisiana Civil Code article 2317, *et seq*.

194.

On information and belief, the Corps had, at all relevant times, the care, custody and control, and thus the *garde* of the MRGO and the GIWW and the levees/floodwalls adjacent thereto. As such the Corps is strictly liable to Plaintiffs for their damages resulting from the vices

and/or defects within the MRGO and the GIWW and their levees/floodwalls, in accordance with Louisiana Civil Code article 2317, *et seq.*

### 195.

Plaintiffs expressly plead the doctrine of *Res Ipsa Loquitur* against each and all of the Defendants, as may be appropriate under the circumstances and permitted by law.

### COUNT VIII:

### NUISANCE AS TO THE 17TH STREET, LONDON AVENUE, AND ORLEANS AVENUE CANALS

### 196.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

### 197.

On information and belief, as the proprietor of the 17th Street, London Avenue, and Orleans Avenue Canals, the Corps, OLD, EJLD, SWB, and St. Paul had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to these canals. As the proprietor of the Industrial Canal, the Corps and PNO had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to this canal. As the proprietor of the MRGO and the GIWW, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to these canals. Because of Defendants  negligence, however, Plaintiffs have been deprived from the use and enjoyment of his property. Thus, Defendants have created a nuisance by ignoring the hazardous conditions in the hurricane protection system.

198.

On information and belief, Defendants have violated the federal common law doctrine of nuisance. The negligent and/or reckless actions of Defendants in creating and ignoring the hazardous conditions in the hurricane protection system have caused unique and significant harm to Plaintiffs as discussed *supra* and have deprived Plaintiffs from the use and enjoyment of their property. Thus, Defendants are liable for Plaintffs' damages, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial.

199.

To the extent SLFPAE is a successor in interest to the OLD and EJLD, Plaintiffs incorporate their allegations against Defendants in paragraphs 196-198 against SFLPAE as well, as though fully set forth herein.

## COUNT IX:

### NEGLIGENCE IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE EAST SIDE OF THE IHNC

200.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

201.

On information and belief, the negligence and/or fault of the USA, acting through the Corps, caused or contributed to cause the failure of the levee and/or flood wall on the eastern side of the IHNC and the New Orleans East Back Levee.

- 61 -

202.

On information and belief, the negligence of the Corps consisted of the following: (1) failing to ensure the use of proper materials in constructing the levees; (2) failing to preserve natural marshes and swamps which acted as a buffer to the New Orleans East Back Levee system from surges off of Lake Borgne; (3) failing to monitor the actions of the contractor; (4) failing to adequately evaluate the potential damage to the levee and/or floodwall structure by storm surges; (5) failing to correct known defects in the levee system; (6) failing to discharge its duty to maintain the integrity of the levee and/or floodwall system and to comply with Congressional and other mandates; (7) and other acts of negligence to be shown at trial of the cause.

203.

On information and belief, the negligence and/or fault of Defendant Orleans caused or contributed to cause the failure of the levee and/or flood wall and/or spoil banks of the IHNC and the New Orleans East Back Levee.

204.

On information and belief, Defendant OLD was granted the authority to establish adequate drainage and flood control in Orleans Parish and other areas within the jurisdiction including the IHNC and the New Orleans East Back Levee. Defendant OLD was specifically granted authority to erect flood control works as they relate to tidewater flooding, hurricane protection, and saltwater intrusion. Defendant OLD was required to engage in the construction and maintenance of levees/ floodwalls and/or spoil banks. All levee districts consist and their commissioners, including OLD, have the responsibility for the care and inspection of levees. OLD negligently failed to carry out its responsibilities. As the proximate result of the negligent,

grossly negligent, reckless, wanton and/or illegal acts or omissions of the Corps and OLD, Plaintiffs sustained damages.

205.

On information and belief, as a direct and proximate result of the Defendants' negligence, the wrongful conduct and/or fault, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys   fees, and other special damages to be proven at trial.

**COUNT X:**

**NEGLIGENCE OF THE CORPS IN THE OPERATION AND MAINTENANCE OF THE MRGO**

206.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

207.

The FTCA places the United States in the same shoes as a private defendant and authorizes Plaintiffs to recover damages based on the Corps' negligent operation and maintenance of the MRGO.

208.

The Corps had a duty not to negligently expose the levee system along Reach 2 to harm. It was evident that harm to the levee system would pose a great risk to both people and property.

- 63 -

209.

The Corps breached its duty not to negligently expose the levee system along Reach 2 to harm by: (1) failing to provide timely foreshore protection to the South Bank and North Bank, which would have helped protect the Reach 2 Levee from the front-side wave attack and loss of height; (2) failing to prevent the widening of the channel to two-to-three times its design width, which created an added fetch that generated a more forceful frontal wave attack on the levee; (3) failing to mitigate against the increasing salinity of the channel and the loss of marsh, wetlands, and vegetation, thus, denuding and destroying a critical natural buffer against storm surge. Due care was clearly absent in the Corps' actions as to the maintenance and operation of the MRGO.

210.

Such negligent acts and/or fault on the part of the Corps were a proximate or legal cause of Plaintiffs' damages from Katrina. Katrina and its devastating aftermath were clearly foreseeable, as the Corps itself admitted erosion to and widening of the channel presented an unsustainable risk.

211.

Plaintiffs' damages were sustained as a direct result of the breach by the Corps of its legal duty to adequately operate and maintain the MRGO. Thus, the Corps is liable to Plaintiffs for all damages sustained by Plaintiffs, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial. But for the fault and/or negligence of the Corps, Plaintiffs' damages would not have occurred.

212.

The Corps was negligent under the La. Civ. Code arts. 2315 and 2316 and is thus liable to Plaintiffs for damages arising from the destruction of the Reach 2 Levee.

213.

Furthermore, the Corps' failures with respect to the maintenance and operation of the MRGO were in direct contravention of professional engineering and safety standards, and did not represent a discretionary policy judgment by the Corps.

## COUNT XI:

## NUISANCE BY THE CORPS AS TO THE MRGO

214.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

215.

As the proprietor of the MRGO, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to the MRGO that has deprived, and threatens imminently to deprive, Plaintiffs from the enjoyment of their property in the event of a hurricane. The Corps has violated this state statutory duty by creating the MRGO's hazardous condition.

216.

As the owner and operator of the MRGO, the Corps also had a federal common law duty to avoid creating a hazardous condition that harms, and threatens imminently to harm, the lives and property of nearby residents in the event of a hurricane. The Corps violated this duty by

allowing the MRGO to become a threat to human life, property, and the environment.

217.

Accordingly, Plaintiffs are entitled to recover damages sustained by them as a result of such nuisance.

218.

The Corps has violated the federal common law doctrine of nuisance. The negligent and/or reckless actions of the Corps in creating and ignoring the hazardous conditions in the hurricane protection system have caused unique and significant harm to Plaintiffs as discussed, *supra*, and have deprived Plaintiffs from the use and enjoyment of their property. Thus, the Corps is liable for Plaintiffs' damages, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial.

## COUNT XII:

## STRICT LIABILITY AS TO THE MRGO

219.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

220.

The Corps had, at all relevant times, the care, custody and control, and thus the *garde* of the IHNC/Industrial Canal, MRGO, and/or the 40 Arpent Canal and the levees/floodwalls adjacent thereto, including such other levees/floodwalls and/or spoil banks in St. Bernard Parish;

as such they are strictly liable to Plaintiffs for their damages resulting from the vices and/or defects therein, in accordance with Louisiana Civil Code article 2317, *et seq*.

221.

The Corps knew, or in the exercise of reasonable care should have known, of the vices that caused Plaintiffs' damages. Further, in the exercise of reasonable care by the Corps, said damages could have been prevented.

222.

Plaintiffs expressly plead the doctrine of *Res Ipsa Loquitur* against the Corps, as may be appropriate under the circumstances and permitted by law.

223.

As a direct and proximate result of the Corps' wrongful conduct and/or fault, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys  fees, and other special damages to be proven at trial.

**COUNT XIII:**

**NEGLIGENCE IN THE DESIGN, CONSTRUCTION, AND**
**MAINTENANCE OF THE GULF INTRACOASTAL WATERWAY**

224.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

225.

On information and belief, the Corps had a legal responsibility and duty to Plaintiffs to cause, allow, and/or conduct the design and construction of the GIWW in a manner that would

not compromise the safety of the New Orleans area. As set forth herein, the Corps was negligent in the design, construction, and maintenance of the Hurricane Protection System around the GIWW in the following, non-exclusive, particulars: construction of the levees and floodwalls with porous, erodible lightweight "shell sand" fill, or other inappropriate fill material not suitable for levee construction, especially without sheetpile cutoff, concrete armoring or similar features to prevent erosion, undercutting, collapse or failure, or due to negligently inadequate height.

226.

On information and belief, as a result of the negligence of the Corps, the deficiencies in the levees and floodwalls of the GIWW were exacerbated by the "funnel effect" created through the ship channels of the MRGO, causing extensive damage to Plaintiffs' property.

227.

On information and belief, as a direct and proximate result of the negligence of the Corps in the design, construction, and maintenance of the GIWW, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys  fees, and other special damages to be proven at trial.

**COUNT XIV:**

**NEGLIGENCE OF THE CORPS AND OLD CONCERNING THE IHNC**

228.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

229.

Plaintiffs aver, on information and belief, that the breaches and failure of the hurricane protection levees and flood walls of the IHNC/Industrial Canal were caused by the negligence and fault of the Defendants Corps and OLD all as set forth herein.

230.

On information and belief, the negligence and/or fault of the Corps caused or contributed to the failure of the levee and/or flood wall and/or spoil bank on the sides of the IHNC/Industrial Canal.

231.

On information and belief, the negligence of the Corps consisted of the following non-exclusive particulars:  (1) allowing the work to proceed; (2) failing to caution the Washington Group International, Inc. ("Washington Group") — which contracted with the Corps in connection with the IHNC/Industrial Canal Lock Replacement Project — about the potential damage to the levee and/or flood wall system by its work; (3) failing to monitor and/or properly inspect the work of the Washington Group; (4) failing to adequately evaluate the potential damage to the levee and/or flood wall structure by the work of Washington Group; (5) failing to correct the damage caused by the actions of the Washington Group; (6) failing to discharge its duty to maintain the integrity of the levee and/or flood wall system of the IHNC/Industrial Canal; and (7) and other acts of negligence or fault to be shown at trial of the cause.

232.

On information and belief, the negligence and/or fault of Defendant OLD caused or contributed to the failure of the levee and/or flood wall and/or I-Walls and/or spoil banks on the

sides of the IHNC/Industrial Canal. Defendant St. Paul, as the insurer of OLD and EJLD, is directly liable to Plaintiffs for their damages.

233.

On information and belief, the negligence and/or fault of Defendant OLD consists of the following non-exclusive particulars: (1) failure to adequately inspect and/or supervise the activities of Defendant Washington Group; (2) failure to ensure the adequacy of Washington Group's procedures; (3) failure to ensure that Washington Group complied with appropriate regulations and standards; (4) failing to note the resulting damage to the levee and/or flood wall system caused by Washington Group's activities; (5) failing to note the under-seepage resulting from the undermining of the integrity of the levee and/or flood wall by the work performed by Washington Group; (6) having noted the under-seepage, in failing to take steps to correct the problems created by Washington Group, or to notify other authorities, of the damage to the levee and/or flood wall system caused by the work performed by Washington Group. As a proximate result of the negligent, grossly negligent, reckless, wanton and/or illegal acts or omissions of the Defendants described herein in this Complaint, Plaintiffs sustained damages. Defendant St. Paul, as the insurer of OLD and EJLD, is directly liable to Plaintiffs for their damages.

234.

On information and belief, the failure of the hurricane protection system along the IHNC is directly attributable to the following multiple flaws and defects in the process: failure to recognize the I-wall tension gap; failure to properly evaluate soil conditions and characteristics; the failure to drive sheet piling to depths sufficient to prevent excessive water intrusion;  failure

to provide adequate safe-guards to adjacent flood protection structure; and the failure to respond to early warnings of potential for excessive seepage.

235.

On information and belief, the flood protection structures along the east side of the IHNC did not perform as intended in the original design. If the structures had been built and maintained to the intended elevation, no significant overtopping would have occurred. With no overtopping, there would not have been any erosion of the supporting soils behind the floodwall.

236.

If the potential for under seepage had been recognized and the seepage prevented, then the lateral stability performance would not have been further compromised.

237.

On information and belief, as a direct and proximate result of the Defendants' negligence, the wrongful conduct and/or fault, Plaintiffs suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), loss of rental value and business earnings, attorneys' fees, and other special damages to be proven at trial. Moreover, Defendant St. Paul, as the insurer of OLD, is directly liable to Plaintiffs for their damages.

## COUNT XV:

## NEGLIGENCE OF LAKE BORGNE

238.

Plaintiffs repeat and re-allege the allegations in all preceding paragraphs as though fully set forth herein.

239.

On information and belief, Lake Borgne failed to discharge its statutorily mandated responsibilities relative to flood control and maintenance of levees along the MRGO and the 40 Arpent Canal, and such failure caused and/or contributed to the damages alleged by Plaintiffs. As a proximate result of the negligent, grossly negligent, reckless, wanton and/or illegal acts or omissions of the Lake Borgne described herein in this Complaint, Plaintiffs sustained damages. Defendant St. Paul, as the insurer of Lake Borgne, is directly liable to Plaintiffs for their damages.

240.

On information and belief, as a direct and proximate result of the Defendants' negligence, the wrongful conduct and/or fault, Plaintiffs suffered property damages and other special damages, including, but not limited to, the following: loss of property (real and personal), immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities and business interruption; evacuation expenses; and other special damages to be proven at trial.  Moreover, Defendant St. Paul, as the insurer of Lake Borgne, is directly liable to Plaintiffs for their damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants and request the following relief from this Honorable Court:

a.    Economic and compensatory damages in amounts to be determined at trial;

b.    Pre-judgment and post-judgment interest as allowed by law;

c.    Attorney fees and costs of litigation pursuant to the Federal Tort Claims Act and/or the Equal Access to Judgment Act;

     d.     Such other relief as the Court deems just and equitable.

**Dated: August 19, 2011**

                  By:     /s/ *James M. Garner*_____

                          James M. Garner #19589, T.A.
                          John T. Balhoff, II #24288
                          Ashley G. Coker #30446
                          **SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.**
909 Poydras St., 28th Floor
New Orleans, LA 701120
Telephone: 504-299-2100
Fax: 504-299-2300
Email: jgarner@shergarner.com

                               - and -

                          James M. Davis, Esq. (*Pro Hac Vice*
Application To Be Submitted)
Noel C. Paul, Esq. (*Pro Hac Vice* Application
To Be Submitted)
**REED SMITH, LLP**
10 S. Wacker Drive, 40th Floor
Chicago, Illinois 60603
Telephone:  312-207-1000
Email: jdavis@reedsmith.com;
npaul@reedsmith.com

                        *Attorneys  for Plaintiffs*